**SEIKO EPSON CORPORATION and Epson America, Inc., Plaintiffs–Appellants,**

v.

**NU–KOTE INTERNATIONAL, INC. and Pelikan Produktions, A.G., Defendants/Cross–Appellants.**

Nos. 97–1313, 97–1548, 97–1566, 97–1567, 97–1588, 98–1015.

United States Court of Appeals, Federal Circuit.

Decided Sept. 8, 1999.

Rehearing Denied; Suggestion for Rehearing En Banc Declined Oct. 19, 1999.

William J. Robinson, Graham & James LLP, of Los Angeles, California, argued for the plaintiffs-appellants. With him on the brief were Brian M. Berliner and David B. Abel.

David Schnapf, Coudert Brothers, of San Francisco, California, argued for the defendants-cross appellants. With him on the brief was Ronald S. Katzy. Of counsel were Robert D. Becker and Eric N. Hoover.

Before NEWMAN, PLAGER, and BRYSON, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Seiko Epson Corporation and Epson America, Inc. (together "Epson") sued Nu–Kote International in the United States District Court for the Central District of California, charging Nu–Kote with patent infringement, unfair competition, false advertising, and trademark infringement, all with respect to certain ink cartridges manufactured by Nu–Kote. The district court granted, on November 30, 1995, a preliminary injunction on, *inter alia*, the patent infringement issue. On appeal of this aspect, we affirmed the action of the district court. *Seiko Epson Corp. v. Nu–Kote Int'l, Inc.*, 104 F.3d 375 (Fed.Cir.1996) (Table). While the appeal of the preliminary injunction was pending Epson amended its complaint to add counts of infringement of three additional patents, *viz.* United States Patents No. 5,156,472 and 5,488,401 and Design Patent No. 365,596, and to join Pelikan Produktions A.G., Nu–Kote's manufacturing affiliate, as a defendant.

On March 5, 1997 the district court held that Epson's United States Patents, No. 5,158,377, 5,221,148, 5,421,658, and 5,156,472 (together "the Suzuki patents") were unenforceable based on inequitable conduct during prosecution in the Patent and Trademark Office. On August 11, 1997 the district court held that Epson's United States Design Patent No. 351,190 ("the D'190 patent") was invalid. The district court refused to expand the injunction to include United States Design Patent No. 365,596 ("the D'596 patent"), ruling that Seiko was "not likely to succeed on the merits." The court in various orders dissolved the portions of the injunction that related to the eliminated patents, issued findings of fact and conclusions of law that there was infringement of the '401 patent, and issued an amended preliminary injunction based on the '401 patent and on trademark, trade dress, and unfair competition issues.

Epson appeals the adverse holdings of patent unenforceability and invalidity and certain procedural issues.[1] We conclude that the district court based its holdings of patent unenforceability and invalidity on erroneous legal principles; these rulings are reversed.

Epson then charged the defendants with violating the preliminary injunction. After hearings, the district court issued various orders holding the defendants in contempt.[2] Nu–Kote and Pelikan cross-appealed the contempt order and its accompanying sanctions in the form of Epson's lost profits and attorney fees. We conclude that the sanctions for contempt must be modified.

I

## NU–KOTE'S SUGGESTION OF BANKRUPTCY

■ This appeal was argued on November 2, 1998. On November 6, 1998 Nu–Kote filed a voluntary petition pursuant to Chapter 11 of the United States Bankruptcy Code. Various motion papers have since been filed in this court. The defendants state that the bankruptcy statute, which stays legal actions against a debtor while under the protection of the bankruptcy court, requires that no further action be taken on this appeal. Epson responds that whether or not the action against Nu–Kote is stayed, co-defendant Pelikan has not suggested bankruptcy. The parties dispute whether a statutory stay as to Nu–Kote effects a stay as to Pelikan.

The stay of legal action against a debtor who has sought protection in bankruptcy is provided in 11 U.S.C. § 362(a)(1):

§ 362 *Automatic stay*

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

The defendants state that Nu–Kote's bankruptcy filing automatically stayed all proceedings, and that the only avenue by which this appeal can continue is by permission of the bankruptcy court. The defendants advise that Epson filed such a motion, entitled Emergency Motion for Relief From the Stay, with the bankruptcy court, and assert that this filing represents Epson's agreement with this interpretation of the stay statute.

On Feb. 10, 1999 the bankruptcy court scheduled the final hearing on Epson's Emergency Motion to be held within twenty days after completion of the presentation of evidence in litigation between Nu–Kote and Hewlett Packard Co. in the Northern District of California. Although Epson had requested immediate disposition of its motion, the bankruptcy court found that Epson's numerous requests for continuances belied the asserted emergency, and could interfere with Nu–Kote's presentation of its case in the Hewlett Packard litigation. The court declined to expedite ruling on Epson's motion. *In re Nu–Kote Holding, Inc.*, No. 398–10600 (Bankr.M.D.Tenn. Feb. 10, 1999). Thus the defendants argue that since the bank-

1. *Seiko Epson Corp. v. Nu–Kote Int'l, Inc.*, No. 95–2734 TJH (E.D. Cal. Mar. 5, 1997, Aug. 11, 1997, and Aug. 15, 1997)

2. *Seiko Epson Corp. v. Nu–Kote Int'l, Inc.*, No. 95–2734 TJH (E.D. Cal. Aug. 11 & 12 1997)

ruptcy court has not held a final hearing on Epson's motion, the stay is in effect as to both defendants. That view is not correct, for in all events Pelikan is not entitled to the benefits of 11 U.S.C. § 362(a)(1).

■■■ The automatic stay provision of the Bankruptcy Act is designed to shield the debtor from the burdens of litigation during the processes of bankruptcy. *See Fortier v. Dona Anna Plaza Partners,* 747 F.2d 1324, 1330 (10th Cir.1984) (the two purposes underlying the automatic stay are "to permit the debtor to organize his or her affairs without creditor harassment and to allow orderly resolution of all claims.") However, proceedings that do not threaten to deplete the assets of the debtor need not be stayed. Nor is violation by the debtor of previously issued orders authorized upon stay of the appeal of those orders. Thus the statutory stay of proceedings as to Nu–Kote did not free Nu–Kote of the contempt orders and the injunctions upon which the contempt was based, all of which were entered before Nu–Kote suggested bankruptcy.

In cases involving multiple parties or multiple claims, the courts have "disaggregated" the proceedings so that claims against co-defendants who are not under the protection of the bankruptcy court may go forward, as well as claims for which stay is unnecessary to protect the debtor. *See In re Chugach Forest Prods., Inc.,* 23 F.3d 241, 246 (9th Cir.1994):

> As a general rule, "[t]he automatic stay of section 362(a) protects only the debtor, property of the debtor or property of the estate. It does not protect non-debtor parties or their property. Thus, section 362(a) does not stay actions against guarantors, sureties, corporate affiliates, or other non-debtor parties liable on the debts of the debtor."

(quoting *Advanced Ribbons & Office Prods. v. U.S. Interstate Distributing,*

*Inc.,* 125 B.R. 259, 263 (9th Cir.BAP 1991)). *See also, e.g., In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litigation,* 140 B.R. 969, 23 USPQ2d 1903 (N.D.Ill.1992).

■■ It is clearly established that the automatic stay does not apply to non-bankrupt co-defendants of a debtor "even if they are in a similar legal or factual nexus with the debtor." *Maritime Elect. Co. v. United Jersey Bank,* 959 F.2d 1194, 1205 (3d Cir.1991). *See also, e.g., Teachers Ins. & Annuity Ass'n v. Butler,* 803 F.2d 61, 65 (2d Cir.1986) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants."); *Marcus, Stowell & Beye Government Securities, Inc. v. Jefferson Investment Corp.,* 797 F.2d 227, 230 n. 4 (5th Cir.1986) ("The well established rule is that an automatic stay of judicial proceedings against one defendant does not apply to proceedings against co-defendants."). The rule also permits claims by the debtor, and counterclaims, to proceed. *See, e.g., Maritime Electric,* 959 F.2d at 1204–05 ("[W]ithin one case, actions against a debtor will be suspended even though closely related claims asserted by the debtor may continue.").

These principles apply equally to appeals that were pending when the bankruptcy stay was invoked. *See, e.g., Austin v. Unarco Industries, Inc.,* 705 F.2d 1 (1st Cir.1983) (when one defendant filed for bankruptcy after plaintiff filed appeal but before argument, court heard and decided appeal on the merits as to the non-bankrupt defendants); *Clay v. Johns–Manville Sales Corp.,* 722 F.2d 1289, 1290–91 (6th Cir.1983) (staying appeal as to the bankrupt appellee, proceeding to the merits as to the issues concerning the non-bankrupt defendant). Thus it is in accordance with law and precedent that this appeal proceed as to the defendant Pelikan. As illustrated in precedent, the disaggregation of a non-bankrupt party from a debtor protect-

ed by § 362 does not require action of the bankruptcy court, for the non-bankrupt party is not under the protection of that court. Thus this appeal shall proceed to decision with respect to Pelikan.

■ We have also considered the effect of our decision on Nu–Kote in view of § 362. Since the appeal was fully briefed, and oral argument held, before Nu–Kote initiated Chapter 11 proceedings, the decision of this appeal does not impose further litigation expenses on Nu–Kote. However, although our conclusion as to the contempt rulings may benefit Nu–Kote, Nu–Kote is correct that waiver of the strictures of § 362(a)(1) as to claims against Nu–Kote requires, in the first instance, decision of the bankruptcy court. That decision has not been made. Thus the appeal insofar as it concerns Nu–Kote remains in abeyance by operation of law. *Cf. Commerzanstalt v. Telewide Systems, Inc.*, 790 F.2d 206, 207 (2d Cir.1986) ("An appeal is indisputably a continuation of a judicial action or proceeding, and therefore this action is automatically stayed if it is one 'against the debtor.'") (citations omitted); *Association of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 449 (3d Cir.1982) ("In our view, section 362 should be read to stay all appeals in proceedings that were originally brought against the debtor, regardless of whether the debtor is the appellant or appellee.")

The previously issued injunction against further infringement remains in effect during Nu–Kote's bankruptcy, *cf. In re Chateaugay Corp.*, 944 F.2d 997, 1008 (2d Cir. 1991) (injunction prohibiting future pollution survives bankruptcy); *In re Cinnabar 2000 Haircutters, Inc.*, 20 B.R. 575, 577 (Bankr.S.D.N.Y.1982) ("the bankruptcy laws should not be a haven for contumacious conduct in violation of a party's judicially-determined tradename rights which will be diluted by a continuation of such conduct behind the shield of the automatic

stay"). As for any tort, Nu–Kote's bankruptcy does not protect it from liability for ongoing violations of the injunction, *cf. In re Cohoes Industrial Terminal, Inc.*, 62 B.R. 369, 378 (Bankr.S.D.N.Y.1986) ("a state court prepetition order which does not relate to the collection of prepetition claims or property of the estate may be enforced by contempt proceedings against the debtor and its officers in order to vindicate the dignity of the state court without violating the automatic stay."), *aff'd* 70 B.R. 214 (S.D.N.Y.1987). The various motions filed upon Nu–Kote's suggestion of bankruptcy are resolved in accordance with this ruling. Therefore Epson's motion to strike the pleading captioned Suggestion of Bankruptcy and Notice of Stay, filed on December 9, 1998, is denied. The defendants' motion to stay the appeal, filed on December 4, 1998 is denied.

Accordingly, we turn to the merits of the issues on appeal.

## II

### UNENFORCEABILITY

Epson appeals the ruling that the four Suzuki patents are permanently unenforceable based on the patentees' failure to comply with 37 C.F.R. § 1.69:

**37 C.F.R. § 1.69** *Foreign language oaths and declarations*

(a) Whenever an individual making an oath or declaration cannot understand English, the oath or declaration must be in a language that such individual can understand and shall state that such individual understands the content of any documents to which the oath or declaration relates.

(b) Unless the text of any oath or declaration in a language other than English is a form provided or approved by the Patent and Trademark Office, it must be accompanied by an English translation

together with a statement that the translation is accurate, except that in the case of an oath or declaration filed under § 1.63, the translation may be filed in the Office no later than two months from the date applicant is notified to file the translation.

The United States patent attorney prosecuting the Suzuki patents, which originated in Japan, had filed declarations in order to correct a description of certain patent drawings as prior art. These declarations were in the English language and had not been translated into Japanese as signed by the Japanese inventors. The district court held that this was a *per se* violation of 37 C.F.R. § 1.69 and rendered the patents permanently unenforceable for inequitable conduct.

Epson first argues that Rule § 1.69 does not apply to the subject matter of these declarations. Epson states that the native language requirement of § 1.69 applies only to the inventors' initial oath or declaration filed pursuant to 37 C.F.R. § 1.63, or a supplemental oath or declaration filed pursuant to 37 C.F.R. § 1.67. Epson states that § 1.69 is contained in that part of the PTO Rules that relates to the filing of the original application, and that the history of this rule makes clear that § 1.69 is concerned with the duty of disclosure of prior art, to assure that inventors are fully aware of their disclosure obligations under § 1.56 which accompany the filing of all patent applications and supplements thereto. This purpose of § 1.69 was described in the Federal Register as follows:

> The rules set forth the duty of candor and good faith which applicants have to the U.S. Patent and Trademark Office and encourage them to provide information about the prior art in a way that will make it more useful to examiners. A provision for foreign language oaths

by individuals who do not understand English is intended to make them more aware of their representations and of their obligations.

*Rules of Practice in Patent Cases,* 42 F.R. 5588 (1977) ("Purpose of Rules"). *See also id.,* 42 F.R. at 5591. Thus Epson argues that the requirement for foreign language oaths relates to ensuring that foreign inventors fully understand the obligations and representations in the inventors' original or supplemental oaths. Epson points out that there is no translation requirement for other oaths or declarations filed during patent prosecution, for example in connection with 37 C.F.R. §§ 1.130–132, and that it is a long-established and routine practice that such documents may be submitted in English.

Epson also states that the documents at issue, which corrected the labelling of certain drawings that had been designated as "prior art" in the Japanese counterparts, did not require an oath at all. Epson states that the subject matter to which the declarations were directed, Figures 9 and 10, were drawings from parent applications of the same inventors, which would be prior art in Japan under Japanese law, but not in the United States. The declarations stated that these Figures represented earlier embodiments made by the same inventors, and traced the Japanese applications in which they originally appeared. The declarations accompanied amendments that removed the designation "prior art" from these Figures. The examiner accepted these documents without objection.

The defendants[3] dispute all of these statements. They argue that the subject matter of the drawings is indeed prior art, that it was not contained in the Japanese parent applications, that the real purpose

---

**3.** The defendants Nu–Kote and Pelikan filed a joint brief; reference to "defendants" is to their joint position as taken and argued.

of the amendments was to introduce support into the specification for a feature disclosed in a patent of Hewlett–Packard and that this purpose was concealed from the PTO, that Epson had in its possession but did not file translations of the Japanese applications that concerned the "prior art" designations, and that the inventors did not know what they were signing, whether or not they understood English.

The special master, reviewing this issue in the context of the defendants' request to abrogate the attorney-client privilege for the purpose of deposing the patent attorney who prepared these declarations, found that there was "no evidence ... that Figures 9 and 10 actually depict prior art" and that there was not a *prima facie* case of fraud such as would affect the attorney-client privilege.

The defendants did not object to the master's findings, *see* Fed.R.Civ.P. 53(e) (written objections to findings must be filed within ten days after the filing of the master's report). However, the defendants point out that the master's findings were made in the context of the attorney-client privilege, and that the master was not charged to decide inequitable conduct. We agree that the master's report did not discuss all of the issues of materiality and intent that are now raised by the defendants. However, the master's finding that the defendants had not presented a *prima facie* case of fraud is relevant, for the asserted fraud was the § 1.69 issue.

■ Epson states that even if § 1.69 did apply, any technical violation was cured by subsequently filed documents. These now-challenged English language declarations were followed by Supplemental Declarations of Inventorship, which were executed in parallel English and Japanese format, in full accordance with § 1.69. These Supple-

mental Declarations of Inventorship stated in Japanese (according to the accompanying translations) that the inventors had "reviewed and understood the contents of the above identified specification, including the claims, as amended by any amendment referred to above [referring to the amendment deleting 'prior art' from Figures 9 and 10]." Thus the challenged English language declarations were followed by Japanese language declarations that referred to the subject matter of the challenged declarations. We agree with Epson that these Japanese declarations remedied any technical flaw, if there were such, in the declarations accompanying the amendment correcting the drawing Figures.[4]

■ Epson also argues that absent fraud or a material misrepresentation made with deceptive intent, failure to comply with § 1.69 does not constitute inequitable conduct of a nature that requires forfeiture of valid patents. We agree. A ruling of inequitable conduct in the PTO must be supported by clear and convincing evidence of material misrepresentation, made with the intent to deceive or mislead the patent examiner. Technical violations of PTO procedures, absent fraud or intentional deception, are not inequitable conduct as would invalidate the patent. The courts have consistently rejected the notion of *per se* forfeiture based on non-fraudulent failure to comply with a rule of practice before the PTO. *See, e.g., Hebert v. Lisle Corp.,* 99 F.3d 1109, 1116 (Fed.Cir. 1996) ("A holding of unenforceability based on the filing of a false oath requires that the oath was false, and made with knowledge of the falsity.... Knowledge of falsity is predicate to intent to deceive."); *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1184 (Fed.Cir.1995) ("intent to deceive should be determined in light of the reali-

---

4. In view of this cure, we do not reach the general question of whether the correct scope of § 1.69 is that every declaration of a non-

English speaking declarant, at every stage of patent prosecution, must be executed in the declarant's language.

ties of patent practice, and not as a matter of strict liability whatever the nature of the action before the PTO.")

The district court did not discuss the master's report, but relied solely on the undisputed fact that the declarations were in the English language when they were signed. The district court ruled that although none of the content of the declarations was false, it sufficed, *per se,* that the documents had not been presented in the Japanese language. The court held that this of itself served to invalidate the patents, and that it was irrelevant that two of the three Japanese inventors testified that they could read and understand English, and the third testified that the document was fully explained to him by a co-inventor, who also so testified. The district court did not find that the inventors, or any person acting on their behalf, intended to deceive or mislead the PTO. For the reasons we have discussed, those rulings do not support a holding of inequitable conduct.

In view of the absence of clear and convincing evidence of fraud or a material omission with deceptive intent, the ruling of unenforceability of the Suzuki patents is reversed.

Epson argues that since paragraphs 1, 3, 4, 5, and 6 of the preliminary injunction order were based on the Suzuki patents, these paragraphs of the injunction should be reinstated by this court. The defendants respond only that the standards for dissolving an injunction are broader than those for granting summary judgment and assert that they provided "substantial alternative grounds" for dissolving the injunction. The decision to grant or deny a preliminary injunction is within the discretion of the trial court. On remand the district court shall reconsider that ruling, on the correct law.

## III

### DESIGN PATENT VALIDITY

The district court ruled that the D'190 design patent was invalid because the de-

sign was "not a matter of concern to consumers." The patent is directed to the design or shape of ink cartridges. The district court reasoned that since the cartridge is not in view after its installation and during use in the printer, the consumer is not concerned with its design and thus that there can not be a valid design patent.

■■■ The premise is incorrect. The validity of a design patent does not require that the article be visible throughout its use; it requires only that the design be of an article of manufacture and that the design meets the requirements of Title 35. *See KeyStone Retaining Wall Systems, Inc. v. Westrock, Inc.,* 997 F.2d 1444, 27 USPQ2d 1297 (Fed.Cir.1993) (design patent for wall blocks much of which are not visible after installation); *In re Webb,* 916 F.2d 1553, 16 USPQ2d 1433 (Fed.Cir.1990) (design patent for a hip prosthesis that is not in view after implantation in patient). The district court erred in holding that an article that is not exposed to view during use can not be the subject of a design patent.

■■■ Nor need the design be aesthetically pleasing. The "ornamental" requirement of the design statute means that the design must not be governed solely by function, *i.e.,* that this is not the only possible form of the article that could perform its function. *See L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1123, 25 USPQ2d 1913, 1917 (Fed.Cir.1993). A design patent is for a useful article, but patentability is based on the design of the article, not the use. The design may contribute distinctiveness or consumer recognition to the design, but an absence of artistic merit does not mean that the design is purely functional.

Since the only ground on which the district court relied was the incorrect ground that the design must be of continuing "concern" during use of the article, and since

the defendants' additional argument of functionality is not meritorious, the judgment of invalidity of the D'190 patent is reversed.

Epson argues that the district court abused its discretion in refusing to modify the preliminary injunction to include the D'596 patent. The Court's only explanation for its refusal was that Epson was "not likely to succeed on the merits." From this, Epson concludes that the district court must have applied the same erroneous reasoning that the design in question is "not a matter of concern to consumers" to the D'596 patent as well. The defendants respond that there are several arguments as to why the D'596 patent should not be added to the preliminary injunction, including a "strong showing of non-infringement," and that any of these arguments could have been the basis for the district court's action.

Since the decision to grant or deny a preliminary injunction is within the discretion of the trial court, Epson may present its arguments in that forum.

## IV

## THE CONTEMPT PROCEEDINGS

The defendants did not comply with the various preliminary injunctions, leading to contempt rulings and sanctions.

### A. Appealability

■ Epson argues that we have no jurisdiction to review the contempt citations, stating that orders of civil contempt are interlocutory and are not appealable before entry of final judgment. *See, e.g., United States v. Westinghouse Elect. Corp.*, 648 F.2d 642, 651 (9th Cir.1981). Epson suggests that there is no final judgment because damages have not been finally assessed.

■ A contempt order is final and appealable when the opportunity to purge the contempt has passed and the position of the parties has been affected by the contempt order. *See Hoffman v. Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268, 1273 (9th Cir.1976) (contempt order deemed final order and appealable when the fines assessed were ordered to be paid). Courts have also viewed a contempt order as appealable when the effect of that order is to modify an injunction. *See International Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, Inc.*, 849 F.2d 1481, 1482 (D.C.Cir.1988). However, when no sanction has been imposed for the contempt and there is no effect on continuing proceedings, interlocutory appeal is unnecessary and therefore unwarranted. *See Blalock Eddy Ranch v. MCI Telecommunications Corp.*, 982 F.2d 371, 373 (9th Cir.1992).

In view of the finality of these contempt orders and our ruling that this appeal is not stayed as to co-defendant Pelikan, we hold that the contempt orders are also before us for review. We confirm the denial of Epson's motion objecting to the cross-appeal of the contempt order. *Seiko Epson Corp. v. Nu–Kote Int'l, Inc.*, 97–1313,–1548,–1566,–1588, 98–1015 (Fed.Cir. Dec. 19, 1997) (Order).

### B. Procedural History

The progress of this litigation has not been tidy. The first preliminary injunction was entered on November 30, 1995, prohibiting the sale by Nu–Kote of the model RF–61 ink cartridge, prohibiting trademark/trade dress violations, and prohibiting any act that would infringe Epson's trademark or several enumerated claims of any of the patents then in suit. For example, paragraph 3 prohibits "Manufacturing, producing, distributing, circulating, selling, offering for sale, importing, exporting, advertising, promoting, displaying, shipping, marketing, or otherwise disposing of any ink cartridge that infringes

claims 71, 74, 78, 79, 80, 83, 84, 89, 90, 91, 92, 96, 97, 98, 99, 100, 101 and 107 of United States Patent No. 5,158,377." On appeal the Federal Circuit temporarily stayed the injunction for lack of findings and conclusions as required by Fed. R.Civ.P. 52(a). The district court then issued findings and conclusions, and concurrently ruled that the newly added RF–60 and RF–62 models also infringe Epson's patents and trademarks. On a renewed motion for a stay, the Federal Circuit reported:

> [T]his court temporarily stayed the injunction noting that the district court had not issued findings or conclusions in conjunction with its injunction. On January 18, 1996, the district court issued findings and conclusions. The findings and conclusions provide that Nukote's two new products, the RF–60 and RF–62, also infringe Epson's patents and trademark. However, the injunction itself was not amended to include these products.

*Seiko Epson Corp. v. Nu–Kote Int'l, Inc.,* No. 96–1102 (Fed.Cir. Feb.28, 1996) (Order) at 3. The Federal Circuit continued to stay paragraphs two through six, covering the broadly-stated portions of the injunction that did not refer to specific products, stating that Nu–Kote was likely to succeed in its arguments that those portions of the injunction were impermissibly vague. The Federal Circuit, deciding the appeal, subsequently affirmed the district court's order on November 25, 1996. *Seiko Epson Corp. v. Nu–Kote Int'l, Inc.,* 104 F.3d 375 (Fed.Cir.1996) (Table). The parties then returned to the district court and sought clarification as to which models were subject to the injunction. The district court denied Epson's request for a temporary restraining order for the RF–60 and RF–62 models, and denied Epson's motions for contempt. Nu–Kote continued to sell these and other products.

The district court ruled from the bench on February 10, 1997 that the Suzuki pat-ents were unenforceable. A hearing was held on March 10, 1997, and the court stated its intention to hold Nu–Kote and Pelikan in contempt for sales of the "RF–60, 61 and 62 product family," to assess damages based on Epson's lost profits, and, since a recall of the infringing products seemed impractical, to order that "none of these items are to be kept on the shelf." A briefing schedule was set for the parties to establish lost profits. The judge stated, in response to a question from Nu–Kote's counsel, that the order would not be effective until a written order was issued, apparently referring to the removal from the shelves of infringing devices still in the channels of commerce. Apparently the defendants did not cease sales of any infringing models leading Epson to bring a second charge that Nu–Kote was violating the preliminary injunction.

On August 11, 1997 the district court ruled that the D'190 patent was invalid, but that the '401 patent was infringed. The court modified the preliminary injunction accordingly, specifically prohibiting infringement of claims 1 and 32 of the '401 patent, and " 'Manufacturing, producing, distributing, circulating, selling, offering for sale, importing, exporting, advertising, promoting, displaying, shipping, marketing, or otherwise disposing of' Nu–Kote's RF–60, RF–61, and RF–62 cartridges, Pelikan's Z630, Z653, and Z654 cartridges, and their generic cartridges IJ1525, IJ1526, and IJ1527." As sanction for violation of the injunction during the period after its initial issuance on November 30, 1995 and before March 10, 1997, the court awarded Epson its lost profits during this period of $1,050,849.00 and attorney fees of $31,413.45.

On August 12, 1997 the court issued a written order holding the defendants in contempt for violating the injunction as to the "RF–60, RF–61, 146 and 147" models during the period between the court's March 10, 1997 ruling from the bench con-

cerning these models and August 6, 1997. Calculation of the sanction for the period after March 10, 1997 was stayed until after this appeal.

The defendants state that this accounting of profits includes sales made by the defendants during the period the injunction was stayed by the Federal Circuit. They also challenge the assessment of any sanction because the Suzuki patents and the D'190 patent, upon which the preliminary injunction was partially based, were held invalid or unenforceable by the district court.

Epson responds that the damages were properly calculated, and points out that the defendants have not even tried to appeal the false advertising grounds of the injunction.

## C. Analysis

The defendants argue that the preliminary injunction properly covered only the model RF–61 cartridge, for that was the only cartridge being sold when the injunction was first imposed. Epson responds that the RF–60 and RF–62 models became subject to the injunction when the district court, in its findings of fact and conclusions of law, determined that they infringe the patents and trade dress. The defendants also state that there can be no contempt for violating an injunction that was based on patents found to be invalid or unenforceable. Epson responds that the violation of the injunction occurred before the Suzuki patents and the D'190 patents were invalidated by the district court.

The defendants argue that the uncertainty concerning the status and scope of the preliminary injunction, during the period after the Federal Circuit's stay of the injunction for lack of findings and conclusions, and then the period of reinstatement, followed by the district court's initial refusal of clarification, require rejecting the contempt rulings. The defendants also argue that the RF–60 and RF–62 cartridges have not been adjudicated to infringe any patent, and thus that sanctions could not properly be based on violation of the preliminary injunction as to these models.

■■■ On December 19, 1996 the district court stated that the RF–60 and RF–62 models were not covered by the preliminary injunction. Although the court later (March 10, 1997) ruled otherwise, sanctions for contempt can not be incurred for sales of these models until they were expressly enjoined. This occurred on August 11, 1997.

■■■ On February 10, 1997 the district court held the defendants in contempt for their continuing sales of the RF–61 models, which had been enjoined since no later than November 30, 1995. A month later, on March 10, 1997, another hearing was held, and contempt found for the RF–60 and RF–62 families including Pelikan and generic-branded products, for sales since November 30, 1995, when the district court first entered the preliminary injunction.

We conclude that the defendants had specific notice of the injunction against the RF–61 class of products as of November 30, 1995; the contempt order with respect to these products is fully supported and is sustained, including the sanctions assessed. Similar specific notice as to the RF–60 and RF–62 classes occurred on August 11, 1997, when these models were explicitly added by issuing an amended injunction. However, contempt for infringement during the period before issuance of the amended preliminary injunction after the March 10, 1997 hearing is limited to the RF–61 and its counterpart Pelikan and generic models.

The order issued August 11, 1997 related to lost profits before the preliminary injunction was amended. The RF–60 and

RF–62 sales must be excluded as a basis of contempt sanctions, during the period before August 11, 1997.

 The assessment of lost profits was an available sanction for contempt. However, the computation thereof requires redetermination in accordance with the modifications set forth herein. We remand for that purpose.

## SUMMARY

The district court's rulings of invalidity and unenforceability are reversed. The orders of contempt are affirmed, but the sanctions assessed are modified and limited to those products specifically enjoined, *i.e.,* the RF–61 class of product, including models only colorably different therefrom, sold after November 30, 1995; and the RF–60 and RF–62 classes sold after August 11, 1997, including the Pelikan and generic counterparts. We remand for appropriate further proceedings.

No costs.

*AFFIRMED IN PART, REVERSED IN PART, MODIFIED, REMANDED*