## NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 16a0176n.06

Case No. 15-5452

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 28, 2016
DEBORAH S. HUNT, Clerk

|  |  |
|---|---|
| In re: FRED M. LEONARD, JR.,      ) <br>      Debtor.      ) <br>      ) <br> _____      ) <br> FRED M. LEONARD, JR.,      ) <br>      Appellant,      ) <br>      ) <br> v.      ) <br>      ) <br> RDLG, LLC,      ) <br>      Appellee.      ) <br>      ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |

BEFORE: BOGGS, GIBBONS, and GRIFFIN, Circuit Judges.

BOGGS, Circuit Judge. After Appellant Fred M. Leonard, Jr. filed for bankruptcy, Appellee RDLG, LLC initiated an adversary proceeding to have one of his debts—the result of a subsequent fraud judgment based on a default sanction—ruled nondischargeable under a statutory exception. Leonard argued that an automatic bankruptcy stay precluded the sanction, that he was not collaterally estopped from relitigating the issue of his fraud, and that, in any event, RDLG did not make out the elements of the statutory exception. Like the bankruptcy and district courts before us, we disagree. We therefore affirm.

I

When Fred Leonard declared bankruptcy, he was delinquent on a monetary sanction owed to the Western District of North Carolina based on an underlying lawsuit and faced the

looming threat of a default-judgment order in that case for his failure to timely pay the sanction. A week later, the federal court in North Carolina entered a default judgment against him on several state-law claims including fraudulent misrepresentation. RDLG then initiated this proceeding, seeking damages and a determination of nondischargeability with respect to the amount owed from the fraud judgment. *See* 11 U.S.C. § 523(a)(2)(A), (a)(4), (a)(6). Both parties filed motions for summary judgment: RDLG with respect to the subsection (a)(2)(A) claim and Leonard as to all of the § 523(a) claims. The bankruptcy court granted RDLG's motion as well as Leonard's motion on the subsection (a)(4) claim. It later granted RDLG's motion to dismiss without prejudice all remaining claims. Leonard appealed both orders, the district court affirmed, and this appeal followed.

The lawsuit before the federal court in North Carolina arose from a soured business deal. In 2010, RDLG was formed as an ownership vehicle for a real-estate development made up of residential lots bordering a golf course. RDLG contracted with RPM Group, a marketing and sales firm owned and operated by Leonard, to market the property and manage a one-day event to sell the lots. By the contract's terms, RDLG and RPM would split the cost of marketing equally and Leonard would earn a commission on each lot sale after the expenses of both parties were recouped. The sale was unsuccessful, and RDLG filed suit against Leonard, RPM, and several others. The complaint alleged common-law claims including fraudulent misrepresentation on the theory that Leonard knowingly inflated his estimation of the prices that the lots would generate at the sale in order to coax RDLG into entering the agreement.

Over the next two years, the parties proceeded through the normal processes of federal civil litigation. After conducting discovery and participating in a failed mediation session, they

consented to having a magistrate judge resolve the dispute. On September 6, 2012, the court ordered counsel to attend an October 3 pretrial conference, with trial set for mid-October 2012.

Then the litigation process unraveled. Late on September 30, Leonard's attorneys (Terri Lankford and local counsel Seth Neyhart) filed motions to withdraw and to postpone the pretrial conference. They revealed that they had not communicated with Leonard in a month and that Lankford was out of the country. The court denied the motions and, threatening to hold counsel in contempt, instructed them to appear at the conference. The next day, Lankford swore by declaration that four weeks earlier, Leonard disclosed his plan to file for bankruptcy and asked her keep the information from the court.

At the pretrial conference, Leonard appeared with Neyhart and RDLG moved for sanctions. *See* Fed. R. Civ. P. 16(f). In an order the following day, the court found that Neyhart had been "wholly unprepared" and had "virtually no knowledge of the case," which rendered the conference "largely a waste of time and resources." It chastised Leonard and his counsel for "ma[king] a mockery of the judicial process." Neyhart, Leonard, and RPM were each separately sanctioned $2500 (and Lankford $5000) to be paid to the clerk of court by October 9. As a final warning, the court advised that "failure of [Leonard] or counsel to comply . . . within the time frame" would result in a default judgment or contempt proceedings against counsel. Lankford and Neyhart were ordered to attend a hearing to determine if further sanctions were appropriate under Federal Rule of Civil Procedure 11.

October 9 came and went without Leonard paying the sanction and, the next day, he filed for Chapter 7 bankruptcy in the Eastern District of Tennessee. At the Rule 11 hearing on October 11, the court issued no additional sanctions. A week later, it entered a default-judgment order on the issue of Leonard's and RPM's liability. Finally, the court stayed the issue of

damages. After the bankruptcy court closed the adversary proceeding, the North Carolina court reopened the case. Early last year, a jury returned a verdict awarding $500,580.36 in damages to RDLG for Leonard's fraudulent misrepresentation.

## II

The thrust of Leonard's appeal contests the district court's order affirming the bankruptcy court's grant of summary judgment to RDLG on the issue of whether debt that he owes in connection with the fraud judgment is nondischargeable in bankruptcy. In particular, he challenges its findings that (a) the sanctions entered against him were excepted from an automatic bankruptcy stay, (b) he was precluded from relitigating the issue of his fraud, and (c) the debt fits within the 11 U.S.C. § 523(a)(2)(A) exception to discharge.

In a bankruptcy appeal, we review the bankruptcy court's factual findings for clear error "without being bound by the district court's determinations." *In re Charfoos*, 979 F.2d 390, 392 (6th Cir. 1992). We review the district court's legal conclusions de novo. *In re Baker & Getty Fin. Servs., Inc.*, 106 F.3d 1255, 1259 (6th Cir. 1997).

## A

The bankruptcy court where a debtor files "shall have exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e)(1). Accordingly, pending judicial proceedings against the debtor are automatically stayed. *See* 11 U.S.C. § 362(a)(1). However, this rule is not without exception. Indeed, it contains "statutory exemptions, and . . . non-statutory exceptions." *Dominic's Rest. of Dayton, Inc. v. Mantia*, 683 F.3d 757, 760 (6th Cir. 2012). The bankruptcy and district courts found that the monetary and default-judgment sanctions were excepted from the automatic stay as non-statutory exceptions or, alternatively, under 11 U.S.C. § 362(b)(4).

Leonard presses two points on appeal. First, he argues that the sanctions are unenforceable because they apply to property of the bankruptcy estate. As a general matter, the initiation of bankruptcy proceedings does transfer a debtor's interest in property to the bankruptcy estate. *See* 11 U.S.C. § 541(a). But the Bankruptcy Code is not an aid to subterfuge. Federal courts have inherent authority to devise sanctions in response to abuses of the judicial process, including violations of their orders. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). Were a debtor permitted to "blatantly violate direct orders of the court and then seek shelter from a bankruptcy judge," then the power to sanction "could be rendered almost meaningless." *Dominic's*, 683 F.3d at 761 (quoting *In re Rook*, 102 B.R. 490, 493 (Bankr. E.D. Va. 1989)); *see also Alpern v. Lieb*, 11 F.3d 689, 690 (7th Cir. 1993) ("A litigant should not be allowed to delay the imposition of sanctions indefinitely by the expedient of declaring bankruptcy."). Leonard was assessed a monetary sanction and given five days to pay it. He ignored the order, filed for bankruptcy, and claimed that his hands were tied since his property interests had been transferred to the bankruptcy estate. Debtors may not wrap themselves in the cloak of § 541 to avoid preexisting sanctions.

Section 362(b)(4) also excepts the sanctions from the stay's effects. The automatic stay does not impede the "continuation of an action or proceeding by a governmental unit . . . to enforce [its] police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit." § 362(b)(4). Through this carve-out, Congress elevated "state and federal governmental interests in securing compliance with certain aspects of those authorities' respective regulatory and police powers" above the power of the automatic-stay provision. *Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 385 (6th Cir. 2001). We have held that government action is exempt from the stay if

designed to effectuate public-policy goals, rather than to protect a pecuniary interest in the debtor's property or adjudicate private rights. *Id.* at 385–86. The monetary sanction may have been pecuniary but neither sanction was levied to protect the court's interest in Leonard's property or to benefit RDLG. Rather, the court had a public-policy goal in mind—"protect[ing] the integrity of the federal court system." *See In re Berg*, 230 F.3d 1165, 1168 (9th Cir. 2000). The district court correctly found that both sanctions were exempt from the automatic bankruptcy stay.

Second, Leonard claims that the default-judgment sanction was improper because the North Carolina court never determined whether the stay applied to the proceeding before it. A non-bankruptcy court presiding over a proceeding that is exempted from the automatic stay may enter orders that are not inconsistent with the stay. *See Chao*, 270 F.3d at 384. We instructed in *Chao* that when responding to a motion to continue or commence proceedings against a debtor, the non-bankruptcy court should determine the stay's effect. *Ibid.* Leonard erroneously reads *Chao* for the broader proposition that a non-bankruptcy court acting sua sponte also must declare on the record whether a bankruptcy stay applies. The animating concern in *Chao*—creditors attempting to circumvent bankruptcy stays—is not so pronounced when a court acts on its own motion. Regardless, the North Carolina court did consider the stay. The default-judgment order acknowledged the pending bankruptcy proceeding and stayed the remainder of the case—resolving the issue of damages—until after the termination of the bankruptcy proceedings. To be sure, this carried risk. An order based on an erroneous jurisdictional determination may later be declared void. *Ibid.* But that uncertainty does not diminish the power of a non-bankruptcy court to determine whether a pending matter is stayed by a debtor's bankruptcy filing. *See In re Singleton*, 230 B.R. 533, 538–39 (B.A.P. 6th Cir. 1999)

B

When an issue has been litigated and determined in one action, the same parties may not later litigate it anew. *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). In diversity cases, a federal court will usually adopt the rules of preclusion that would be applied by the courts of the state where it sits. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508–09 (2001). "This federal reference to state law will not obtain, of course, in situations in which the state law is incompatible with federal interests." *Id.* at 509. The bankruptcy court applied federal rules of issue preclusion because North Carolina law (which it found gives no preclusive effect to issues determined by default) was incompatible with federal interests in this case. Since Leonard does not contest that holding, the issue is waived, and we look to federal collateral-estoppel principles without opining on whether North Carolina rules should or should not apply. *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006).

Under federal law, issue preclusion prevents a party from relitigating a matter if: (1) the precise issue was raised and actually litigated in a prior proceeding; (2) the determination of the issue was necessary to the outcome of that proceeding; (3) the prior proceeding resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought had a full and fair opportunity to litigate the issue in the prior proceeding. *Ark. Coals, Inc. v. Lawson*, 739 F.3d 309, 320–21 (6th Cir. 2014). Leonard argues that the first and fourth elements were not satisfied.

1

An issue is actually litigated when it "is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined." Restatement (Second) of Judgments § 27 cmt. d (1982). That did not happen here, Leonard asserts, because the fraud claim was resolved through a default-judgment order instead of a hearing on the evidence. His argument is not

wholly without support. In *Arizona v. California*, the Supreme Court explained that issue preclusion does not attach to judgment by default because "none of the issues is actually litigated." 530 U.S. 392, 414 (2000) (quoting Restatement (Second) of Judgments § 27 cmt. e). Likewise, we have stated (in a dictum) that under federal law, collateral estoppel does not bar relitigation in bankruptcy court of issues not litigated earlier due to default judgment. *Spilman v. Harley*, 656 F.2d 224, 228 (6th Cir. 1981); *see also In re Calvert*, 105 F.3d 315, 319 (6th Cir. 1997). But does that general rule apply to default entered as a procedural sanction under Federal Rule of Civil Procedure 16? We now hold that it does not.

The "default" contemplated by the Court in *Arizona* (and the Restatement comment that it quotes in support), is that of the ordinary case—where a defendant "fail[s] to plead or otherwise defend" against the plaintiff's claim, Fed. R. Civ. P. 55(a). The Restatement explains that an issue is not "actually litigated" when judgment is entered "by confession, consent, or default" because a party "choose[s] not to raise [it], or to contest an assertion." Restatement (Second) of Judgments § 27 cmt. e. This refers to scenarios in which issues go unraised or uncontested by a party's choice. *See In re Corey*, 583 F.3d 1249, 1251–52 (10th Cir. 2009). The same is true of our decision in *Spilman*. The cases that it cites for the proposition that issues decided by default judgment are not actually litigated all involve failure to plead or defend. 656 F.2d at 228.

When default is the result of a failure to plead or defend, giving the judgment collateral-estoppel effect might "discourage compromise, . . . decrease the likelihood that the issues . . . would be narrowed by stipulation, and thus . . . intensify litigation." Restatement (Second) of Judgments § 27 cmt. e. In those cases, "[t]he interests of conserving judicial resources, of maintaining consistency, and of avoiding oppression or harassment of the adverse party are less

compelling." *Ibid.* Those interests *do* come into play when default is entered as a procedural sanction for lack of good-faith participation in the litigation process. *See Corey*, 583 F.3d at 1252. In litigation that is closely related to the underlying case, such as bankruptcy proceedings, giving preclusive effect to a Rule 16 default-judgment sanction advances those interests all the more. *See* 18A Charles Alan Wright et al., Federal Practice and Procedure § 4442 (2d ed. 2002); *see also In re Docteroff*, 133 F.3d 210, 215 (3d Cir. 1997); *In re Daily*, 47 F.3d 365, 368–69 (9th Cir. 1995); *In re Bush*, 62 F.3d 1319, 1324–25 (11th Cir. 1995).

Before default was entered, Leonard actively litigated the lawsuit: He engaged several attorneys, filed an answer and amended answer, served and responded to discovery requests, and appeared personally at the pre-trial conference. On the eve of trial, he ignored the pretrial order and case-management plan, and moved to continue the proceeding (apparently to obscure his imminent bankruptcy filing). The dismayed court imposed monetary sanctions. Fully aware that noncompliance could result in a default-judgment order, Leonard took his chances. He chose poorly—and a default sanction was entered pursuant to Rule 16. Far from being denied his day in court, Leonard spent two years litigating before changing course. As the North Carolina district court said, his "bad faith throughout the[] proceedings . . . prejudice[d] [RDLG], the judicial process, and the administration of justice." Applying issue preclusion here served its basic purposes—"protecting the prevailing party from the expense and vexation attending multiple lawsuits, conserving judicial resources, and fostering reliance on judicial action by minimizing the possibility of inconsistent decisions." *Daily*, 47 F.3d at 368 (quoting *Montana v. United States*, 440 U.S. 147, 153–54 (1979)) (alterations omitted).

"[A] full and fair opportunity to litigate entails . . . the procedural requirements of due process." *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 483 n.24 (1982). The court's "sense of justice and equity," not an "automatic formula," guides proper rulings on estoppel pleas. *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 334 (1971).

No significant procedural limitation impeded the North Carolina trial, let alone procedures so inadequate that they deprived Leonard of the opportunity to litigate. Over two years, he participated in extensive discovery, a mediated settlement conference, and successfully defended against a motion for pre-judgment attachment. When the court imposed a monetary sanction, it warned that his failure to comply could "result in the Court striking the answer of Defendants and entering default judgment against Defendants." Just as due process is not violated by the entry of a default-judgment sanction for a defendant's bad-faith refusal to cooperate with discovery, *see Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 209–10 (1958), neither is it violated when a default order issues in response to willful noncompliance with pretrial orders and a sanction order.

Leonard's argument to the contrary is unconvincing. He asserts that his absence from the Rule 11 hearing (where the court decided not to impose additional sanctions on his attorneys) robbed him of a full and fair opportunity to litigate. The court's default order did state that the default sanction was based on reasons given and an oral order issued at the Rule 11 hearing. Yet any alleged defect in that hearing did not undermine the fairness of the entire proceeding. Leonard had every opportunity to litigate vigorously. Instead, "he plotted and schemed to delay and undermine the trial," and was made aware of the probable repercussions. His absence from the Rule 11 hearing (of which he had notice)—after he flouted a sanction order, disregarding the

glaring consequences—does not cast doubt on "the quality, extensiveness, or fairness of procedures followed" by the North Carolina court. *Montana*, 440 U.S. at 164 n.11. We therefore hold that Leonard was collaterally estopped from relitigating the issue of his fraud.

C

The only question remaining is whether the resulting debt is excepted from discharge under 11 U.S.C. § 523(a)(2)(A). Debtors in Chapter 7 proceedings who satisfy several conditions may discharge their debts. 11 U.S.C. § 727(a); *Kontrick v. Ryan*, 540 U.S. 443, 447 (2004). However, Congress established exceptions to discharge by which "debtors' interest in a complete fresh start" yields to "creditors' interest in recovering full payment of debts." *Grogan v. Garner*, 498 U.S. 279, 287 (1991); *see also* 11 U.S.C. § 523. We construe those exceptions narrowly to promote the central purpose of the discharge—a fresh start for debtors. *See In re Bucci*, 493 F.3d 635, 642 (6th Cir. 2007).

One such exception is for "any debt . . . for money, property, services, or . . . credit, to the extent obtained by . . . actual fraud." § 523(a)(2)(A). To establish the exception, the creditor must prove by a preponderance of the evidence that: "(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss." *In re Rembert*, 141 F.3d 277, 280–81 (6th Cir. 1998) (footnote omitted); *see also In re Pazdzierz*, 718 F.3d 582, 586 (6th Cir. 2013).

A North Carolina fraud judgment corresponds to "actual fraud" under § 523(a)(2)(A). Fraud in § 523(a)(2)(A) comprises "the general common law of torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular State." *Field v. Mans*, 516 U.S.

59, 70 n.9 (1995). When the "actual fraud" language was added to the Code in 1978, "the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976)." *Id.* at 70 (footnote omitted). As in North Carolina, fraud as defined by the Restatement consists of "(1) fraudulent misrepresentation (2) of fact, opinion, intention, or law, (3) for the purpose of inducing reliance, (4) justifiable reliance." Dan B. Dobbs et al., The Law of Torts § 664 n.1 (2d ed. 2011); *see also* Restatement (Second) of Torts § 525; *Forbis v. Neal*, 649 S.E.2d 382, 387 (N.C. 2007).

Leonard argues that the North Carolina judgment is insufficient alone to establish nondischargeability because the exception applies only to debtors who "obtained" "money, property, services, or . . . credit" through their fraud, which he did not. § 523(a)(2)(A). It would appear that several circuits have split on the question whether the exception requires that the debtor *obtain* something from the fraud, rather than only causing loss to the victim of the fraud. *Compare Muegler v. Bening*, 413 F.3d 980, 983–84 (9th Cir. 2005), *and In re M.M. Winkler & Assocs.*, 239 F.3d 746, 749 (5th Cir. 2001), *with In re Rountree*, 478 F.3d 215, 222–23 (4th Cir. 2007). The bankruptcy court here adopted the reading of subsection (a)(2)(A) preferred by the Fifth and Ninth Circuits.

The facts of this case allow us to leave the question for another day. Leonard clearly obtained a financial benefit from his fraud. Even the stricter reading of subsection (a)(2)(A) does not rigidly require plaintiffs to prove the direct transfer of money from a creditor to a debtor. It is sufficient to "show that the debtor . . . indirectly obtained some tangible or intangible financial benefit as a result of his misrepresentation." *In re Brady*, 101 F.3d 1165, 1172 (6th Cir. 1996). Through the contract, RPM—and Leonard as its owner—stood to earn a commission on each sale of RDLG land. As the complaint alleges (and the default judgment confirms), that contract

came about through fraudulent misrepresentation. Leonard therefore "obtained" a right to the commissions, or their value, *see* 11 Joseph M. Perillo, Corbin on Contracts § 55.3 (rev. ed. 2005) ("[T]he aim [of damages] is to put the injured party in as good a position as that party would have been in if performance had been rendered as promised."). Any debt that arises from Leonard's fraud is therefore excepted from discharge. *See Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998). Thus, Leonard's full liability ($500,580.36 by the North Carolina jury's reckoning) falls within the exception. We affirm the bankruptcy court's judgment that the § 523(a)(2)(A) exception applies to Leonard's fraudulent misrepresentation.

### III

Leonard also argues that the bankruptcy court exceeded its authority by (a) deciding that his fraud was nondischargeable without determining the amount of the claim and (b) granting voluntary dismissal to RDLG on its remaining claims. We review for abuse of discretion. *See Bridgeport Music, Inc. v. Universal-MCA Music Publ'g, Inc.*, 583 F.3d 948, 953 (6th Cir. 2009).

### A

Although we have held that a bankruptcy court *may* enter final judgment on the amount of a nondischargeable claim, *In re Hart*, 564 F. App'x 773, 776 (6th Cir. 2014), we have never held that it must do so. Bankruptcy courts sit in equity. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988). Courts of equity with jurisdiction over the parties to a controversy generally "decide all matters in dispute and decree complete relief," *Alexander v. Hillman*, 296 U.S. 222, 242 (1935)—even matters that could also be decided by courts of law, *Porter v. Warner Holding Co.*, 328 U.S. 395, 399 (1946). So long as it is exercising that power within the bounds of the Bankruptcy Code (and the Constitution, *Stern v. Marshall*, 131 S. Ct. 2594, 2620 (2011)), a bankruptcy court may answer the nondischargeability question without

deciding the value of the claim. *See* 11 U.S.C. § 105(a); *In re Granger Garage, Inc.*, 921 F.2d 74, 77 (6th Cir. 1990).

We have acknowledged that it is oftentimes difficult, "impossible" even, "to separate the determination of dischargeability function from the function of fixing the amount of the nondischargeable debt." *In re McLaren*, 3 F.3d 958, 966 (6th Cir. 1993) (quoting *In re Devitt*, 126 B.R. 212, 215 (Bankr. D. Md. 1991)). But this is not such a case. The North Carolina court where RDLG and Leonard spent two years litigating the fraud claim was well-equipped to oversee the jury trial that resolved the amount of damages that flowed from it. We are not swayed by Leonard's contention that returning the case to the North Carolina court frustrated the purpose of collateral estoppel and promoted a "multiplicity of appeals." Appellant Br. 48. Reserving the task of determining damages to a court well-acquainted with a given case is not contrary to the interests of conserving judicial resources, maintaining consistency, and avoiding harassment of adverse parties. *See* Restatement (Second) of Judgments § 27 cmt. e. The bankruptcy court's decision to leave for the North Carolina court the issue of damages was not an abuse of discretion.

B

In an adversary proceeding, a plaintiff may request dismissal of an action against a debtor. *See* Fed. R. Civ. P. 41(a)(2); Fed. R. Bankr. P. 7041. An abuse of discretion occurs only when the debtor would "suffer 'plain legal prejudice' as a result of a dismissal without prejudice, as opposed to facing the mere prospect of a second lawsuit." *Grover ex rel. Grover v. Eli Lilly & Co.*, 33 F.3d 716, 718 (6th Cir. 1994) (quoting *Cone v. W. Va. Pulp & Paper Co.*, 330 U.S. 212, 217 (1947)). Relevant factors in considering whether a defendant (or debtor) will suffer plain legal prejudice include the effort and expense of his preparation, excessive delay and lack

of diligence by the plaintiff, insufficient explanation for the need to dismiss, and whether the defendant has filed a motion for summary judgment. *Ibid.*

The bankruptcy court here acted within its discretion when it granted voluntary dismissal of RDLG's § 523(a)(6) and money-judgment claims. Its denial of the dueling summary-judgment motions on the § 523(a)(6) claim reflected its assessment that the law did not clearly dictate a result for either party. *See id.* at 719. Leonard does not argue otherwise. Nor did that ruling strip Leonard of any absolute defense. As for the money-judgment claims, Leonard has expended no additional effort preparing for their defense. RDLG's motion explained that litigating those claims would be redundant given the court's grant of summary judgment in its favor on the § 523(a)(2)(A) claim. The bankruptcy court's order disposing of all remaining claims is not comparable (contrary to Leonard's suggestion) to the dismissal of some claims while others remain. *Cf. Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1106 (11th Cir. 2004). The bankruptcy court's order was a matter of routine housekeeping and did not amount to an abuse of discretion.

IV

For these reasons, we AFFIRM the grant of summary judgment to RDLG on the 11 U.S.C. § 523(a)(2)(A) claim. We also AFFIRM the bankruptcy court's decisions not to determine the amount of that claim and to grant voluntary dismissal to RDLG on its remaining claims.